(No. 49213.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. ROBERT WILLS, Appellee.

*Opinion filed March 23, 1978.*

William J. Scott, Attorney General, of Springfield, and Bernard Carey, State's Attorney, of Chicago (Donald B. Mackay, Assistant Attorney General, of Chicago, and Lee T. Hettinger and Michael E. Shabat, Assistant State's Attorneys, of counsel), for the People.

Sherman C. Magidson, of Chicago (Carl P. Clavelli, of counsel), for appellee.

MR. JUSTICE MORAN delivered the opinion of the court:

The defendant, Robert Wills, was indicted for perjury alleged to have been committed during his testimony before a Cook County grand jury investigating improprieties in the licensing practices of the Illinois Department of Insurance (Department). Following a bench trial, the defendant was convicted and sentenced to four years of probation, with the first six months to be served in a work-release program. The appellate court reversed the conviction, reasoning that either the defendant's answers were literally true or the questions posed to him were too confusing and ambiguous to serve as a basis for a perjury conviction. (44 Ill. App. 3d 585.) We granted the State's petition for leave to appeal.

The defendant was employed as an insurance examiner with the Department from June 1969 until his dismissal on March 2, 1973. Shortly after his dismissal, the defendant telephoned his friend, Gordon Casper, who was head of the Department's examining unit, and asked to speak with him regarding the insurance broker's examination of William Daley. (Casper had supervised that examination, conducted in Chicago on Friday, March 16, 1973, and had taken the examination papers back to his home in Springfield for the weekend.) Casper acknowledged that Daley had taken the March 16 examination, and agreed to discuss the same with the defendant. Upon defendant's arrival at Casper's home, Casper permitted him to peruse the Daley examination, after which defendant noted that there were "too many vacancies, too many unanswered questions" on it. He asked Casper if he could fill in some answers as a favor to a State senator and Casper agreed. The defendant spent between 20 and 35 minutes doing so. Casper then returned the paper to the

batch of ungraded examinations. During the week, the examinations were graded. Casper graded the Daley examination and gave it a passing score. The grade was recorded, and Daley was subsequently notified that he was eligible for an insurance broker's license.

Approximately a year later, both Casper and the defendant received subpoenas to testify before the grand jury on Wednesday, March 20, 1974. Defendant and Casper met in Springfield on the Saturday before the grand jury session. Defendant told Casper that he had again spoken to the senator and that they should "play it cool like [they] had before." Casper agreed. During their flight to Chicago, the two agreed to "stick to [their] story."

When the defendant appeared before the grand jury, he was advised of his right to remain silent and that anything he might say could be used against him in a court of law. He was also advised of his right to confer with an attorney in the anteroom. (In accordance with statute, counsel was not permitted to accompany the defendant into the session. Ill. Rev. Stat. 1973, ch. 38, par. 112—6(a).) The defendant's testimony, which is the subject of the perjury charge, proceeded as follows.

The defendant answered that he had had occasion to grade insurance examinations while he was with the Department. He acknowledged that he and two other employees had graded examinations taken on December 13, 1971. He was shown an examination written by a John Daley on that date, and, noting his own handwriting in the margins, admitted that he had graded that particular examination. Defendant then responded to a series of questions dealing with applications for examinations, testifying that he had nothing to do with applications and that applications were processed in a department other than that in which he was employed. These questions and answers followed:

"Q. Has anyone there ever offered you anything of

value for grading an examination favorable to them?

A. Never.

Q. Have you ever received anything for grading an examine [*sic*] for someone?

A. Never. Never. Nothing, no.

Q. In your course of employment with the insurance department have you ever encountered such offers to other graders?

A. Repeat your question please?

Q. While you were working for the department of insurance did you ever become aware of any offers to others?

A. I have heard of it yes.

Q. Who? What examiner?

A. Well I have been offered myself. This was very common. Anyone that has anything to do with a license this is very common to anybody.

Q. Wait a second; you said that you were never offered anything of value?

A. Oh I am sorry I misunderstood you. I thought you said did you ever take anything of value.

Q. Okay. People did offer you money?

A. I have had an offer, yes.

Q. Do you recall who?

A. I wouldn't know who they were. I made it appear as if I were insulted for you offering me to take the money.

Q. How many times did this happen?

A. Well actually say a half a dozen times; I wouldn't know really the number.

*Q. Did you ever change anyone's answer on an examination?*

*A. Never.*

*Q. Did you ever cross out words that someone had written on an exam?*

*A. No.*

*Q. Have you ever written in answers for someone?*
*A. Never."*

(The italicized questions and answers were the basis of the perjury conviction.)

The defendant's attention was then again directed toward the December 13, 1971, examination of John

Daley.

On May 10, 1974, Casper received another grand jury subpoena. He telephoned the defendant and informed him of the subpoena. They met the following evening at the defendant's home, at which time Casper told the defendant that, upon the advice of counsel, he was going to tell the truth. The defendant replied that he would not "change his story." On May 16, 1974, Casper, under a grant of immunity, detailed what had happened for the grand jury.

At the defendant's trial on the perjury indictment, the State elicited testimony from Casper, and from two handwriting experts, which established beyond a reasonable doubt that the defendant had written in answers to questions 1—B, 13, 29—B, 37, 42, 44—A, and 46 on the March 16, 1973, examination of William Daley. The defendant was not implicated in any way in misconduct relating to the December 13, 1971, examination of John Daley. The State introduced into evidence the transcript of the defendant's grand jury testimony. The defendant offered no testimony, but introduced into evidence the transcript of Casper's grand jury testimony on March 20, 1974, and the original indictment charging the defendant with three counts of perjury. The original indictment, filed on May 2, 1974, alleged that the defendant had committed perjury when asked questions "pertaining to his function in grading insurance examinations for the Illinois Department of Insurance." A new indictment, filed June 6, 1974, deleted the above-quoted clause and substituted in its stead, "pertaining to the intentional unauthorized alteration of insurance examination answers on Insurance Broker's Examinations given by the Illinois Department of Insurance."

It is the defendant's contention that the prosecutor's questions were ambiguous and confusing, and that defendant's answers were literally true, in that, while he was

employed by the Department, he had not "change[d] anyone's answer," "cross[ed] out words," or "written in answers" on any examination. The contention is founded on the fact that the defendant's employment with the Department had terminated 16 days prior to the date on which he had altered William Daley's examination.

A person commits perjury when, "under oath or affirmation, in a proceeding or in any other matter where by law such oath or affirmation is required, he makes a false statement, material to the issue or point in question, which he does not believe to be true." (Ill. Rev. Stat. 1975, ch. 38, par. 32—2(a).) Casper's testimony recounting the sequence of events both before and after the defendant's grand jury appearance provides sufficient circumstantial proof of the defendant's intention to withhold information which was within his personal knowledge. If the only question was whether the defendant was predisposed to lie before the grand jury, we would not hesitate to affirm the conviction in deference to the trial judge's appraisal of the weight and credibility of the testimony. However, the defendant's predisposition is not the issue.

The issue, simply stated, though not so easily resolved, is whether it can be concluded beyond a reasonable doubt that the defendant made a false statement. To determine this, we must rely upon the transcript of the grand jury session itself. In this regard, the trial judge was in no better position than we to interpret the defendant's grand jury testimony.

In *Bronston v. United States* (1973), 409 U.S. 352, 34 L. Ed. 2d 568, 93 S. Ct. 595, the Supreme Court held that a perjury conviction cannot be sustained if the answers, though not responsive to the questions posed, are literally true. There, the colloquy read:

> "Q. Do you have any bank accounts in Swiss banks, Mr. Bronston?
> A. No, sir.

Q. Have you ever?

A. The company had an account there for about six months, in Zurich.

Q. Have you any nominees who have bank accounts in Swiss banks?

A. No, sir.

Q. Have you ever?

A. No, sir." (409 U.S. 352, 354, 34 L. Ed. 2d 568, 571, 93 S. Ct. 595, 598.)

Evidence established that the defendant also had had a Swiss bank account, but that he did not have the account on the date he was questioned.

In the case at bar, both the responsiveness and the truthfulness of the defendant's answers depend upon whether the questions could have reasonably related to two critically different time frames. The State contends that because the prosecutor's questions incorporated the term "ever," their time frame was all encompassing and not limited to the defendant's period of employment with the Department. Certainly, when the questions are isolated, the time frame appears all encompassing. However, an examination of the immediate context in which the questions were asked reveals that the defendant could have reasonably interpreted the time frame of the question to be circumscribed by his employment with the Department.

We note at the outset that the questions and answers at issue must be interpreted in the context of what immediately preceded and succeeded them. " 'A charge of perjury may not be sustained by the device of lifting a statement of the accused out of its immediate context *** thus giving it a meaning wholly different than that which its context clearly shows.' " (*Van Liew v. United States* (5th Cir. 1963), 321 F.2d 674, 678; *Fotie v. United States* (8th Cir. 1943), 137 F.2d 831, 842.) We recognize that almost any question can be interpreted in several ways when subjected to careful scrutiny after the fact. We also recognize, however, that, at the time of an interrogation, a

questioner may not be aware of facts or time frames which, known to the witness, may create an ambiguity in questions posed. It is not, however, the responsibility of a witness, as the State suggests, to clarify or attempt to clarify questions which might tend to implicate him. "The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry." *Bronston v. United States* (1973), 409 U.S. 352, 360, 34 L. Ed. 2d 568, 575, 93 S. Ct. 595, 601; *People v. White* (1974), 59 Ill. 2d 416, 421.

In *People v. White* (1974), 59 Ill. 2d 416, 420-21, it was held that a defendant cannot be convicted of perjury "for a truthful answer to a question subject to various interpretations. *** The questions must be stated in such a precise way as not to require interpretation or construction by those who are required to answer them under oath." The *White* court reversed a conviction for perjury, finding that a question on a liquor license application form could reasonably be interpreted to either include or exclude the defendant. The benchmark is whether the words involved, read in their immediate context, are susceptible to a reasonable interpretation other than that intended by the questioner, and whether the witness' answer truthfully responds to his reasonable interpretation of the words.

In the case at bar, the defendant was asked, "While you were working for the department of insurance did you *ever* become aware of any offers to others?" (Emphasis added.) The defendant answered that he was aware of such offers, that he himself was offered money in exchange for grading examinations favorably, and that he could not recall who made such offers or how many times such offers were made. Immediately thereafter, the prosecutor asked whether defendant had in fact tampered with answers on an examination. It is reasonable for the defendant to have assumed that those questions referred

only to the limited time frame established by the prosecutor's previous questions. Particularly because the prosecutor did not know at the time of the questioning that the defendant's involvements occurred after he left the employ of the Department, there is no reason to assume that the prosecutor intentionally broadened the scope of the questions or, more importantly, that he conveyed a broader scope to the defendant. It is of no consequence that the defendant's answers were unequivocally "Never" and "No." If the defendant could reasonably have interpreted the questions to refer to his period of employment with the Department, as we so hold, then his unequivocal answers were both responsive and truthful.

The State argues that even if the defendant had answered, "No, I never tampered with exams while I was employed with the Department of Insurance," his answers would nonetheless have been perjurious. The State cites *United States v. Nickels* (7th Cir. 1974), 502 F.2d 1173, for this assertion. In *Nickels,* a grand jury asked the defendant whether he had received any money from any persons while on official duty as a Chicago policeman. The officer responded, "No, sir, not for my duties." (502 F.2d 1173, 1178.) The court, in affirming the perjury conviction, noted that the initial response, "No, sir," was directly responsive and false and that the attempted hedge, "not for my duties," was nonresponsive and therefore irrelevant. (502 F.2d 1177, 1178.) Here, the flaw in the State's analogy is that had the defendant appended to his answers that he never tampered with exams "while *** employed with the Department of Insurance," the answers would have been both true and responsive in light of the circumscribed time frame previously established by the prosecutor.

A testimonial ambiguity similar to the one at bar resulted in the reversal of a perjury conviction in *Van Liew v. United States* (5th Cir. 1963), 321 F.2d 674. In *Van*

*Liew,* the defendant was alleged to have committed perjury when he testified at an injunction hearing regarding the economic adulteration and misbranding of an orange drink. The perjury indictment charged that the defendant falsely testified as follows:

> "Q. In the running of this operation or processing is there any way or any means by which water can be introduced into the product?
>
> A. Not to my knowledge." (321 F.2d 674, 677 n.6.)

The government argued that the defendant's answer was literally untrue and that it was made in response to a question encompassing the entire production process. The defendant contended that the context only related to the pasteurization portion of the process and that his answer was not therefore false. The court agreed with the defendant, stating:

> "When read in light of the surrounding testimony, one of two things is clear. The first is that we think the Defendant's answer obviously referred to the pasteurization process alone. [Footnote omitted.] But second, if this is not so as an established fact, the uncertainties as to what the interrogator thought, or what the swearer thought the interrogator thought by the words 'operation or processing' are such that neither we nor a jury could hold that knowing falsification was proved beyond a reasonable doubt." 321 F.2d 674, 678-79.

A grand jury is "a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime." (*Blair v. United States* (1919), 250 U.S. 273, 282, 63 L. Ed. 979, 983, 39 S. Ct.

468, 471.) A grand jury witness need not be informed of the subject matter of the inquiry or of the names of persons about whom he is to testify. A grand jury witness has no opportunity to clarify his answers through redirect examination conducted by his attorney. It is precisely because a grand jury inquest facilitates such broad, nonadversarial inquiry that we place the burden on the prosecutor to establish without ambiguity the temporal frame of reference for his questions.

We have ascertained that when the defendant appeared before the grand jury, he was not informed of the nature or scope of the grand jury investigation; the broad scope of the prosecutor's inquiry related to the defendant's role as a grader of insurance examinations; the narrower inquiry concentrated specifically on the December 13, 1971, examination of John Daley, which the defendant had graded; and both areas of inquiry presumed that the defendant was employed with the Department in a position to grade insurance examinations. Additionally, two related factors support our conclusion that the questions could have reasonably been interpreted by defendant to refer to the period of his employment.

During the entire grand jury session, no question was directed to a time frame after the defendant's employment with the Department. No question was directed, specifically or by reference, toward the March 16, 1973, examination of William Daley. There is no indication in the grand jury transcript that the prosecutors had any interest in the defendant's activities outside his employment with the Department.

The second related factor is that the original indictment itself, drawn by the prosecutor and voted upon by the grand jury, specified in each of its three counts that the understood time frame was the period of defendant's employment with the Department. Each of the counts charged that the defendant answered perjuriously when

asked questions "pertaining to his function in grading insurance examinations for the Illinois Department of Insurance." It was not until after Casper's second appearance before the grand jury that the wording of the new indictment attempted to encompass a broader time frame.

For the foregoing reasons, we affirm the judgment of the appellate court.

*Judgment affirmed.*