161 P.3d 333 (2007)
In the Matter of the DISCIPLINARY PROCEEDING AGAINST Margita A. DORNAY, Attorney at Law.
Nos. 200,315-0, 200,320-6.
Supreme Court of Washington, En Banc.
June 21, 2007.
*335 Robert Franklin Noe, Robert F. Noe PLLC, Yakima, WA, for Petitioner.
Kevin M. Bank, Washington State Bar Association, Seattle, WA, for Respondent.
C. JOHNSON, J.
¶ 1 In this case, we consider whether an attorney who admittedly gave false testimony in a court proceeding should be suspended or disbarred. Disbarment is the American Bar Association's (ABA) presumptive sanction for attorneys who give false testimony in a court proceeding under the ABA's Standards for Imposing Lawyer Sanctions (1991 & Supp. 1992) (ABA Standards). The focus of this case centers on the appropriate sanction after weighing the aggravators against the mitigators in light of sanctions imposed in similar cases.
¶ 2 Margita A. Dornay was charged by the Washington State Bar Association (WSBA) with three counts of misconduct under the Rules of Professional Conduct (RPC). The WSBA Disciplinary Board (Board) found Dornay intentionally gave false testimony as a witness during a dissolution proceeding but determined she did not commit perjury. The Board unanimously recommended a three-year suspension, which modified the hearing officer's recommendation that Dornay receive a two-month suspension.
¶ 3 In the WSBA's appeal, it argues Dornay should be disbarred because it is the ABA's presumptive sanction for attorneys who give false testimony in a court proceeding under ABA Standards 5.11 and 6.11 and that after weighing the aggravators and mitigators, the Board erred in deviating from the presumptive sanction. In her appeal, Dornay argues her behavior was not misconduct, and no sanction is appropriate. After careful review, we agree with the Board's unanimous recommendation that the appropriate sanction is a three-year suspension.

FACTUAL AND PROCEDURAL HISTORY
¶ 4 On April 27, 2004, the WSBA filed an amended formal complaint charging Dornay as follows:
Count I
In making inconsistent material statements under oath in two or more official proceedings . . . one or the other of which was false and which respondent knew to be false, respondent committed the crime of perjury (RCW 9A.72.050(1)) and/or engaged in dishonesty, deceit and/or misrepresentation, in violation of RPC 8.4(b) and/or RPC 8.4(c) and/or RPC 8.4(d) and/or RPC 3.3(a)(1).
Count II
In making inconsistent statements under oath in two or more official proceedings . . . one or the other of which was false and which respondent knew to be false, respondent committed the crime of false swearing (RCW 9A.72.050(1) and (2)) and/or engaged in dishonesty, deceit, and/or misrepresentation, in violation of RPC 8.4(b) and/or RPC 8.4(c) and/or RPC 8.4(d) and/or RPC 3.3(a)(1).
Count III
In testifying falsely under oath in Snohomish County Superior Court on February 13, 2002 and/or June 5, 2002 and/or King County District Court on June 5, 2002 and/or at her WSBA deposition on January 16, 2003, respondent violated RPC 3.3(a)(1), RPC 8.4(c) and/or RPC 8.4(d).
¶ 5 The three separate counts pleaded by the WSBA and presented to the hearing officer and the Board, and repeated in the briefing before us, have focused on whether the misconduct constitutes criminal perjury or false swearing. Certainly a previous adjudication of criminality can support a finding that the RPCs have been violated. However, *336 in this case, no criminal conviction exists. The focus of the RPCs centers on the conduct of the attorney in light of the requirements of the rules. Bar disciplinary proceedings are not criminal in nature and the policies underlying criminal misconduct versus attorney misconduct sometimes differ. More appropriately, the disciplinary proceeding focuses on the attorney's alleged misconduct. While certain principles may overlap between a criminal act and the attorney's conduct, again, the focus in the disciplinary proceedings is on the requirement of the rules. Ultimately, we must determine whether the conduct (lying under oath) violates the attorney's responsibilities under the rules, and if so, determine the appropriate sanction.

Facts
¶ 6 In 2001, Dornay began an extramarital affair with King County Sheriff Deputy, David Hick. Dornay was a partner with the law firm of Kenyon, Dornay, Marshall (KDM), and a contract prosecutor for the city of Kenmore where she met Hick. When the affair began, Dornay was living with Robert Noe, her husband, and their four daughters. Hick was in the process of divorcing his wife.
¶ 7 During the course of their affair, Dornay and Hick took trips out of town together including a trip to Vancouver, B.C., in November 2001, during which time Hick became enraged after an argument and slammed his head on a nightstand, cutting open his forehead. On another occasion, Hick put his service revolver in Dornay's hand and told her to pull the trigger because if she did not love him, he wanted to die.
¶ 8 Dornay continued the relationship with Hick, giving him love notes of reassurance, sending him flowers, and allowing Hick to pick up her daughters from school. Dornay and Hick acquired new cell phones to aid in concealing their relationship. Dornay called Hick almost daily.
¶ 9 On February 13, 2002, Dornay testified under oath at Hick's divorce trial in Snohomish County Superior Court. Hr'g Officer's Finding of Fact (FOF) at 8. Dornay was called to testify regarding the child visitation exchanges she had witnessed between Hick and his wife. Hick's attorney did not know about Dornay's ongoing affair with Hick. Dornay testified and answered a series of background questions about how well she knew Hick.
¶ 10 While on the stand, Dornay was asked by Hick's attorney whether she had ever seen him "rageful at any time" or whether she had seen him "rant and rave" or "berate." FOF at 8. Dornay answered no to these questions. This testimony is at the center of this proceeding.
¶ 11 In March 2002, Dornay broke off relations with Hick. Soon after, she informed her father and her husband about the affair with Hick. In a conversation with her father, Dornay confessed she was not "truthful" when she testified in court that she had never seen Hick in a rage. FOF at 15.
¶ 12 On May 14, 2002, Dornay petitioned for an order of protection against Hick, alleging he was abusive and threatening to her and her family. On June 5, Dornay testified at the protection order hearing. She testified under oath that Hick screamed at her, raged at her, and ranted and raved during the course of their relationship, including the time period prior to the February 13, 2002 dissolution proceeding. After the protection order hearing, Dornay signed a sworn declaration that she "made the decision to perjure" herself on February 13, 2002. FOF at 14. This sworn declaration was filed on June 6, 2002 by Hick's former wife's attorney in the Superior Court of Snohomish County in support of a petition to suspend Hick's visitation rights with his son; on June 21, 2002, the court granted the petition. FOF at 14. Again, on January 16, 2003, during a deposition taken by the WSBA in the course of its investigation, Dornay stated under oath that her testimony in the dissolution action on February 13, 2002 was false. FOF at 15.

Hearing Officer
¶ 13 At the conclusion of Dornay's disciplinary hearing, the hearing officer found that Dornay knowingly made materially misleading statements under oath in Snohomish County Superior Court, proving count three; *337 but, the hearing officer held the WSBA did not sustain its burden of proof by a clear preponderance of the evidence in counts one and two. The hearing officer reasoned Dornay's answers were "literally truthful" because Dornay asserted her testimony was given in the context of observations of Hick's behavior while in the performance of his duties, and not given in the context of her personal relationship with Hick.

Disciplinary Board
¶ 14 On review, the Board reversed in part and affirmed in part. As to count two, the Board reversed the hearing officer by a vote of 9-4 and held the WSBA proved that Dornay committed the crime of false swearing by testifying falsely under oath at the February 13 dissolution hearing. As to count one, the Board voted 7-6 that perjury was not proved, narrowly affirming the hearing officer's determination that Dornay had not committed perjury. The Board increased the hearing officer's recommended sanction of a two-month suspension to a three-year suspension after weighing the aggravating and mitigating factors.
¶ 15 Both the WSBA and Dornay appealed. In their respective appeals, the WSBA contends the Board did not properly weigh the mitigating and aggravating factors, and it asserts Dornay should be disbarred. The WSBA also argues that perjury in count one was proved. Dornay argues her behavior was not misconduct and no sanction is appropriate.

ISSUES PRESENTED
¶ 16 (A) Whether the Board erred in finding Dornay failed to establish the affirmative defense of duress, pursuant to RCW 9A.16.060, as to counts one, two, and three.
¶ 17 (B) Whether the Board erred in finding a clear preponderance of the evidence did not support a charge of perjury as alleged in count one, but supported a charge of false swearing as alleged in count two, pursuant to RCW 9A.72.050(1), in violation of RPC 8.4(b) and/or RPC 8.4(c) and or RPC 8.4(d) and /or RPC 3.3(a)(1).
¶ 18 (C) Whether the Board properly applied "cooperation with the disciplinary proceedings" as a mitigating factor when determining Dornay's sanction.
¶ 19 (D) Whether the Board properly weighed the mitigating and aggravating factors when determining Dornay's sanction.

ANALYSIS

Standard of Review
¶ 20 This court has plenary authority to determine the nature of lawyer discipline, but it has delegated specific responsibilities to the WSBA. A hearing officer makes findings of fact, conclusions of law, and recommendations to the Board. The Board is free to adopt, modify, or reverse the hearing officer's findings, conclusions, or recommendations. In re Disciplinary Proceeding Against Whitney, 155 Wash.2d 451, 461, 120 P.3d 550 (2005). We review conclusions of law de novo. In re Disciplinary Proceeding Against Halverson, 140 Wash.2d 475, 485, 998 P.2d 833 (2000).

Analysis
¶ 21 Throughout the disciplinary proceeding, Dornay claimed she told the truth when she testified and, alternatively, that she lied when she testified because she was under duress at the time. Dornay's later admission that her testimony was false resolves her "truthfulness" argument. Because she admitted to the falsity of her trial testimony in both the hearing seeking a protection order and in her deposition by the WSBA, no argument by Dornay can be sustained that she did not knowingly make materially misleading statements under oath in a judicial proceeding. Therefore, we agree with the conclusion of the Board that, based on her own admissions, Dornay gave false testimony in a court proceeding.
¶ 22 The relevant portions of the RPC provide:
It is professional misconduct for a lawyer to:
. . . .
(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

*338 (d) engage in conduct that is prejudicial to the administration of justice. . . .
RPC 8.4(c), (d).
(a) A lawyer shall not knowingly:
(1) make a false statement of material fact or law to a tribunal. . . .
RPC 3.3(a)(1).
¶ 23 We conclude Dornay violated each of these rules.

Duress Defense[1]
¶ 24 Dornay argues her misconduct should be excused because she was under duress at the time she testified. However, neither the hearing officer nor the Board agreed that Dornay established a duress defense. Washington's duress statute requires the person to have, inter alia, "an apprehension . . . that in case of refusal he or she or another would be liable to immediate death or immediate grievous bodily injury. . . ." RCW 9A.16.060(1)(a). We agree with the hearing officer that Dornay presented insufficient evidence to support duress. At the time she testified in Hick's dissolution hearing, we can find no facts or other testimony that supports Dornay's assertion that she was in imminent apprehension of immediate death or bodily injury. No one threatened Dornay or forced her to testify falsely. While the questions asked may have "surprised" her, she alone chose the answers. Conversely, evidence was presented which negates a duress defense. For example, the day after Dornay testified, she sent Hick a dozen roses and romantic cards acknowledging her feelings of respect and love for Hick and referenced other aspects of the ongoing nature of their relationship. We agree with the decision of both the hearing officer and the Board that the duress defense was not established.

False Swearing and Perjury
¶ 25 We neither need to decide nor discuss whether the misconduct in this case constitutes criminal perjury or criminal false swearing. The focus of the RPCs centers on the conduct of the attorney in light of the requirements of the rules. Under the RPCs, and in light of the findings, coupled with Dornay's admissions that she perjured herself, the Board correctly concluded count two was supported by the evidence. We adopt the finding of the Board that count two was proved, and find Dornay violated RPC 8.4(c) ("engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation"), RPC(d) ("engag[ing] in conduct that is prejudicial to the administration of justice"), and RPC 3.3(a)(1) ("mak[ing] a false statement of material fact or law to a tribunal"). Under the ABA Standards, which we utilize in determining an appropriate sanction, the presumptive sanction for this misconduct is disbarment.[2]

Weighing the Mitigating and Aggravating Factors
¶ 26 In determining the sanction to be imposed for attorney misconduct, we utilize the ABA Standards as a basic, but not conclusive guide. Under the Standards, we first determine the presumptive sanction and then whether the sanction should be heightened or reduced after weighing the aggravating and mitigating factors. In re Whitney, 155 Wash.2d at 468, 120 P.3d 550 (citing In re Halverson, 140 Wash.2d at 492-93, 998 P.2d 833).
*339 ¶ 27 Here, the Board unanimously concluded that Dornay acted with intent to deceive the court; consequently, it found that ABA Standard 6.11 (disbarment) is the appropriate standard. We hold that ABA Standards 5.11 and 6.11 apply in this case, and we agree with the Board that the presumptive sanction of disbarment is appropriate.

Identifying the Aggravating and Mitigating Factors
¶ 28 The appropriate sanction in this case will be determined on how we assess and evaluate the aggravating and mitigating factors. We consider aggravating and mitigating factors, which may alter the presumptive sanction (in this case disbarment) or decrease a suspension. We will generally adopt the Board's recommended sanction unless the sanction departs significantly from sanctions imposed in other comparable cases or the Board was not unanimous in its decision. In re Disciplinary Proceeding Against Haley, 156 Wash.2d 324, 339, 126 P.3d 1262 (2006).
¶ 29 In an effort to defend against any sanction, Dornay asserts a separate statutory defense to the allegation that she engaged in misconduct.[3] Although this argument is not necessarily a defense to an RPC violation, it could mitigate the presumptive sanction if established. RCW 9A.72.060 is a retraction statute that provides that no persons shall be convicted of perjury or false swearing if they retract their false statement in the course of the same proceeding in which it was made, if they do so before the falsification substantially affects the proceeding.
¶ 30 Here, we find the hearing officer and the Board properly rejected this argument because the retraction was made too late. The trial court issued its oral opinion March 7, 2002. The fact that Dornay waited four months after the court issued its opinion to file her retraction, knowing her statements were false, precludes her from asserting the retraction defense; thus, we now turn to the sum of the aggravating and mitigating factors.

Aggravators
¶ 31 The Board affirmed the hearing officer's finding of three aggravating factors.
¶ 32 First, the hearing officer found the factor of "dishonest or selfish motive" applied because Dornay offered false testimony primarily to keep her ongoing affair with Hick secret. FOF at 21. While Dornay did not explicitly admit she testified falsely to keep her affair with Hick a secret, her motive for doing so is a logical inference from the evidence of her actions the day after she gave false testimony, i.e., she sent Hick a dozen roses and romantic cards. Furthermore, aside from her duress defense, Dornay presents no argument challenging the Board's conclusion on this factor. Because the inference of Dornay's selfish motive is a reasonable one and is unchallenged, we agree with the finding of the hearing officer and the Board that the aggravating factor of dishonest or selfish motive applies.
¶ 33 Second, the Board affirmed the hearing officer's finding that "vulnerability of victim" applied as an aggravating factor because Dornay created a false impression of Hick that could have affected the judge's decision regarding the parenting plan for Hick's three-year-old child. FOF at 21.
¶ 34 The WSBA argues the three-year-old child was vulnerable and could have been affected by Dornay's false testimony, relying on the Board and hearing officer's findings that Hick's propensity for ragefulness was highly relevant to the visitation decision of the court.
¶ 35 Dornay argues vulnerability of the victim does not apply because Judge Knight testified he relied upon the guardian ad litem's (GAL) report in establishing Hick's visitation rights.
¶ 36 While Judge Knight did testify that he relied on the GAL report to establish visitation rights, he also testified he granted the mother's motion for suspension of Hick's visitation rights after he received a copy of *340 Dornay's petition for a restraining order against Hick. Judge Knight testified that the GAL report he relied on earlier did not substantiate the mother's allegations that Hick had an anger management problem. Later, in Dornay's petition for the restraining order, she asserted that Hick was unstable and threatening, and she claimed she was fearful for her safety. If the judge had the benefit of Dornay's truthful testimony at the time she testified on Hick's behalf, her testimony could have affected the judge's decision regarding the parenting plan for Hick's three-year-old child.
¶ 37 Vulnerability of the victim was addressed by the court in Christopher: "clients unfamiliar with the legal system . . . are not vulnerable victims absent a showing of physical or mental disability or other characteristic that renders them `particularly vulnerable.'" In re Disciplinary Proceeding Against Christopher, 153 Wash.2d 669, 682, 105 P.3d 976 (2005) (quoting In re Disciplinary Proceeding Against Anschell, 149 Wash.2d 484, 514, 69 P.3d 844 (2003)). Here, a three-year-old is `particularly vulnerable' to a person who has propensity for ragefulness. Because Dornay's false testimony about Hick's ragefulness could have affected the three-year-old boy's safety, we uphold the hearing officer and the Board's finding that the aggravating factor of vulnerability of the victim applies.
¶ 38 Finally, the Board affirmed the hearing officer's finding that the factor of "substantial experience in the practice of law" applied because Dornay had over 10 years' experience prosecuting misdemeanors, including domestic violence cases. FOF at 50. This factor is largely uncontested.

Mitigating Factor of "Cooperation with the Disciplinary Proceedings"
¶ 39 The Board applied a mitigating factor to Dornay's case according to ABA Standards 9.32(e), which provides a reduced degree of discipline if the attorney provides "full and free disclosure to disciplinary board or cooperative attitude toward proceedings."
¶ 40 The WSBA argues that the court has effectively dispensed with this as a mitigating factor. In Whitt, we stated, "An attorney is expected to cooperate fully with the discipline process and should not be rewarded for `coming clean' after lying in the disciplinary proceedings. `[C]ooperating with the disciplinary proceedings is not a mitigating factor, even though lack of cooperation may be an aggravating factor.'" In re Disciplinary Proceeding Against Whitt, 149 Wash.2d 707, 721, 72 P.3d 173 (2003) (alteration in original) (quoting In re Disciplinary Proceeding Against Huddleston, 137 Wash.2d 560, 579, 974 P.2d 325 (1999)).
¶ 41 While Dornay does not challenge the WSBA's assertion that cooperating with the disciplinary proceedings is not a mitigating factor, we have applied this as a mitigating factor in cases subsequent to Whitt.
¶ 42 In Christopher, the Board adopted all mitigating factors as determined by the hearing officer, including Christopher's cooperation with the disciplinary proceedings. The WSBA did not challenge this as a mitigating factor, and we upheld all the Board's conclusions on the mitigating factors except for one (personal or emotional problems). In re Christopher, 153 Wash.2d at 683-87, 105 P.3d 976.
¶ 43 Cooperation with the disciplinary proceedings as a mitigating factor may be appropriate in some cases. Here, while Dornay did not self-report to the WSBA and she still claims her behavior was not misconduct, we will defer to the Board's finding that Dornay fully cooperated with its disciplinary proceedings.

Other Mitigators
¶ 44 The Board unanimously concluded the hearing officer improperly applied three mitigating factors. The Board struck the mitigator of "timely good faith effort to rectify consequences of misconduct" based on Dornay's experience as a prosecutor trying domestic violence cases. The Board found Dornay understood the danger to the child in delaying truthful testimony. The Board also struck the mitigator of "imposition of other penalties and sanctions" due to insufficient evidence proving Dornay suffered any other "penalties or sanctions" from her conduct. Board Order at 6.
*341 ¶ 45 Finally, the Board struck the mitigator of "remorse" but did not explain its reasoning for removing it. Board Order at 6. In the hearing officer's recommendation, he stated Dornay felt guilty and remorseful from the time she testified on February 13, 2002. FOF at 22.
¶ 46 Here, Dornay continues to assert that her behavior was not misconduct, and she argues no sanctions are appropriate. Because Dornay's conduct involved dishonesty and misrepresentation to the court, and considering she admitted to lying under oath yet continues to argue her behavior was not misconduct, we find remorse does not apply as a mitigating factor.
¶ 47 The Board upheld the hearing officer's application of "personal or emotional problems" as a mitigating factor. The hearing officer reasoned Dornay experienced marital problems and symptoms of posttraumatic stress disorder because of circumstances involving her extramarital affair with Hick. FOF at 50.
¶ 48 The WSBA does not challenge the application of "personal or emotional problems" as a mitigating factor, but it does argue the mitigator should receive minimal weight. We disagree. As the hearing officer found:
[t]he relationship between Dornay and Hick was intense and emotional. Dornay and Hick argued over the fact that Hick was dating other women, over whether Dornay should or would leave her husband to be with Hick, and over their true intentions in the relationship. Dornay and Hick had a pattern of arguments and reconciliations in the relationship. This pattern is consistent with the cycle of tension, verbal abuse or assault, and a "honeymoon" period that characterizes domestic violence, or, in this case, intimate partner violence.
FOF at 36.
¶ 49 The Washington Legislature and the courts of this state have recognized the profound impact of intimate partner violence. While the nature of Dornay's relationship with Hick does not excuse Dornay's actions, it is a mitigating factor that merits substantial weight. The remaining mitigating factor is "absence of a prior disciplinary record" and is largely uncontested. FOF at 21-22.

Appropriate Sanction for False or Misleading Testimony under Oath
¶ 50 The aggravating and mitigating factors we must balance in determining Dornay's sanction are the aggravating factors of dishonest or selfish motive, vulnerability of victim, substantial experience in the practice of law, and the mitigating factors of personal or emotional problems, cooperation with the disciplinary proceedings, and absence of a prior disciplinary record. The weight given to a mitigating factor is determined by the totality of the circumstances. In re Whitt, 149 Wash.2d at 721, 72 P.3d 173 (citing In re Disciplinary Proceeding Against Vetter, 104 Wash.2d 779, 794, 711 P.2d 284 (1985)).
¶ 51 Here, given the totality of the circumstances, we adopt the Board's finding that the weight of the mitigating factors exceeds the weight of the aggravating factors.

Proportionality
¶ 52 The Board should deviate from the presumptive sanction only if the aggravating or mitigating factors are sufficiently compelling to justify a departure. In re Disciplinary Proceeding Against Anschell, 141 Wash.2d 593, 615, 9 P.3d 193 (2000).
¶ 53 We will adopt the Board's recommended sanction unless the sanction is not proportionate or the Board was not unanimous in its decision. In re Disciplinary Proceeding Against Miller, 149 Wash.2d 262, 277-78, 66 P.3d 1069 (2003).
¶ 54 The Board unanimously decided that Dornay's conduct warranted a three-year suspension. The WSBA relies on Whitney and Whitt to assert the proportionality of disbarment is justified.
¶ 55 In Whitney, the court disbarred an attorney who falsely testified as a GAL in a dissolution proceeding. The attorney falsely asserted he had spoken to school teachers of the children who were the subject of the *342 custody dispute. In re Whitney, 155 Wash.2d 451, 120 P.3d 550.
¶ 56 In Whitt, the court disbarred an attorney who falsified evidence in her disciplinary proceeding. The court stated Whitt's lack of veracity weighed heavily in favor of disbarment. In re Whitt, 149 Wash.2d at 721, 72 P.3d 173.
¶ 57 Dornay argues the Board's three-year suspension and the WSBA's suggestion of disbarment are disproportionate. Dornay asserts her behavior was not misconduct; therefore, no sanction is appropriate. Alternatively, Dornay contends that if the court finds misconduct, the sanctions imposed must be consistent with sanctions previously imposed by the court. Dornay compares her case to In re Disciplinary Proceeding Against Dynan, 152 Wash.2d 601, 98 P.3d 444 (2004) and Christopher, and asserts hers is a less egregious violation, so she should receive a sanction of suspension, not disbarment.
¶ 58 In Dynan, we found the attorney had knowingly altered bills and submitted false declarations to the court. We found Dynan's mental state of intent rendered disbarment as the presumptive sanction. We reduced a recommended nine-month suspension to a six-month suspension after we reviewed similar cases involving bill alterations. In re Dynan, 152 Wash.2d 601, 98 P.3d 444.
¶ 59 In Christopher, we found the attorney forged legal documents, as well as her secretary's signature, to avoid a malpractice claim. In adopting the Board's recommendation, we determined the presumptive sanction was disbarment because Christopher committed the criminal act of forgery. After weighing the mitigating and aggravating factors and after a proportionality analysis, we found the presumptive sanction too harsh and upheld the Board's recommendation of an 18-month suspension followed by a three-year period of probation. In re Christopher, 153 Wash.2d 669, 105 P.3d 976.
¶ 60 The WSBA argues Dynan did not involve false testimony and the attorney did not act with a dishonest or selfish motive. In contrast, the WSBA asserts Dornay acted with a dishonest and selfish motive and intended to mislead the court. Also, the WSBA argues Christopher is distinguishable from Dornay's case because the court found eight mitigators and two aggravators, which justified a reduction in the presumptive sanction of disbarment.
¶ 61 Here, Dynan and Christopher are not analogous because Dornay did not alter bills or forge documents and submit them to the court. Dornay's case is more similar to Whitney and Whitt because she falsely testified under oath in a court proceeding. In those cases, we disbarred the attorneys.

CONCLUSION
¶ 62 One of the key obligations of an attorney is to maintain the highest standards of ethical conduct. Above all, the hallmark of an attorney's ethical conduct is to be truthful to the tribunal, especially under oath, when an attorney's own sworn testimony is material to the outcome of an official proceeding.
¶ 63 We agree with the Board's unanimous recommendation and order Dornay be suspended from the practice of law for three years.
ALEXANDER, C.J., MADSEN, BRIDGE, OWENS and FAIRHURST, JJ., concur.
SANDERS, J. (dissenting).
¶ 64 Despite sanctioning attorney Margita Dornay for allegedly making false statements under oath, the majority gives only a scant analysis to whether her statements were actually false. At issue are allegations that Dornay violated RPC 3.3 and 8.4.[1] These charges are all predicated on the assumption Dornay lied under oath. However, considering the context of the questions and their ambiguity, one cannot say by a clear preponderance of the evidence Dornay intentionally testified falsely. Like the hearing examiner, we should hold Dornay's statements were literally true.
*343 ¶ 65 Dornay was having an extramarital affair with King County Sheriff's Office deputy Dave Hick and was asked to testify as a character witness at his divorce. Hick's divorce attorney, Ruth Spalter, asked Dornay whether she had ever seen Hick angry. While Dornay had seen Hick upset during their personal encounters, Spalter  who was unaware of Dornay's relationship with Hick  seemed to be asking only about Dornay's observations of and interactions with Hick as a police officer.[2] Because Dornay never saw Hick become enraged or irate at the workplace, one cannot say with high probability she did not answer truthfully.
¶ 66 Literally true statements, even if misleading or unresponsive, cannot support a perjury conviction because there is no falsity. Bronston v. United States, 409 U.S. 352, 362, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973).
Under the pressures and tensions of interrogation, it is not uncommon for the most earnest witnesses to give answers that are not entirely responsive. Sometimes the witness does not understand the question, or may in an excess of caution or apprehension read too much or too little into it. . . . It is the responsibility of the lawyer to probe; testimonial interrogation, and cross-examination in particular, is a probing, prying, pressing form of inquiry. If a witness evades, it is the lawyer's responsibility to recognize the evasion and to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination.
Id. at 358-59, 93 S.Ct. 595. Furthermore, a literally true answer is not perjury even if it is nonresponsive, subject to conflicting interpretations, or even false by implication. United States v. Shotts, 145 F.3d 1289, 1297 (11th Cir.1998), overruled on other grounds by Arthur Andersen LLP v. United States, 544 U.S. 696, 125 S.Ct. 2129, 161 L.Ed.2d 1008 (2005). In State v. Olson, 92 Wash.2d 134, 137, 594 P.2d 1337 (1979), we incorporated Bronston's holding in our own state law. "The burden is on the questioner to pin the witness down to the specific object of his inquiry. Precise questioning . . . is imperative as a predicate for perjury." Id. at 139, 594 P.2d 1337 (relying on Bronston, 409 U.S. at 358-60, 93 S.Ct. 595).
¶ 67 Here the questions were anything but precise. The majority and the bar association hinge their argument on the phrase "at any time," suggesting Spalter was asking whether Dornay had seen Hick enraged in either her personal or professional relationship with him. Majority at 336. But this claim ignores the context of the question. The critical issue is whether Dornay's responses were intentionally false. See Olson, 92 Wash.2d at 139-40, 594 P.2d 1337 (quoting In re Rosoto, 10 Cal.3d 939, 949-50, 519 P.2d 1065, 112 Cal.Rptr. 641 (1974)). We must look at the context of the question to isolate its meaning, and if it's unclear, then we cannot say with sufficient certainty the answer is false.[3] As our Court of Appeals has said:

*344 In order to sustain a perjury conviction, the questions and answers which support the allegation must demonstrate both that the defendant was fully aware of the actual meaning behind the examiner's questions and that the defendant knew his answers were not the truth. United States v. Eddy, 737 F.2d 564, 567 (6th Cir.1984). The questions and answers at issue must be interpreted in the context of what immediately preceded and succeeded them. People v. Wills, 71 Ill.2d 138, 374 N.E.2d 188 [, 15 Ill.Dec. 753] (1978).
State v. Stump, 73 Wash.App. 625, 628, 870 P.2d 333 (1994).[4] Considering the context, Spalter's question could easily be understood to mean, "Have you ever seen Hick enraged at any time as a police officer?"
¶ 68 The four questions immediately preceding the allegedly perjurious testimony concerned Dornay's interactions with Hick in her capacity as a prosecutor and his as a police officer. Spalter was laying a foundation to discuss what Dornay had seen in the context of Dornay's professional relationship with Hick. After some initial confusion over what the attorney was asking, Dornay gave a lengthy answer detailing how Hick acted on the job. Then the attorney asked whether Dornay had ever seen Hick be angry with his son. If the attorney meant to ask Dornay if she had ever seen Hick angry  at any time and in any capacity  then why ask separately about Hick and his son? Clearly, both Spalter and Dornay believed the initial questions specifically pertained to Hick's actions as a police officer. Unaware of any affair, Spalter had no reason to ask Dornay anything outside her professional experiences with Hick, and Dornay had no reason to suspect she was being asked about such things. The questions and answers fail to demonstrate Dornay was fully aware of some different meaning of the questions. See Stump, 73 Wash.App. at 628, 870 P.2d 333. If the question is to be understood out of context, it is incumbent upon the attorney to use her skills to probe, pry, and press to flush out the whole truth by being specific as to what the question is asking. See Bronston, 409 U.S. at 358-59, 93 S.Ct. 595.
¶ 69 Additionally, ambiguity is as much a matter of grammar as it is of substance. See United States v. Cook, 489 F.2d 286, 287 (9th Cir.1973) ("After a careful analysis, we are unable to draw a meaningful distinction between the response to the ill phrased question before us, and the unresponsive answer to the question in Bronston." (footnote omitted)); United States v. Esposito, 358 F.Supp. 1032, 1033 (N.D.Ill.1973) ("The unresponsiveness is a matter of grammar rather than substance, in our opinion, and constitutes a negative answer to the question."). Spalter's nearly incoherent questions likely exacerbated Dornay's confusion. Spalter wanted to know if Dornay had either seen Hick angry in his duties as a police officer or angry at his son. Instead of asking those rather simple questions, the attorney asked (1) Had Dornay ever seen Hick be "rageful"; (2) had Dornay ever seen Hick "rant and raved"; and (3) had Dornay ever seen Hick "berate?" The final two questions are tantamount to nonsense. Only the first question is grammatically coherent, though the attorney used the uncommon adjective "rageful," which clearly created confusion considering Dornay had to repeat the word back to Spalter. See 8 Oxford English Dictionary 108 (1933) (describing rageful's usage as obscure and rare). Spalter's dubiously worded queries only amplified the ambiguity of her questioning and the situation.
¶ 70 The majority hinges its analysis on the fact Dornay later thought she committed *345 perjury. Majority at 337-38. But one must do more than just think they've committed an illegal act  one must actually do something illegal. An early hypothetical first introduced by Francis Wharton and used by the New York Court of Appeals illustrates this:
Lady Eldon, traveling in Europe, purchased a quantity of French lace at a high price, intending to smuggle it into England without payment of the duty. When discovered in a customs search, the lace turned out to be of English origin, of little value and not subject to duty. The traditional view is that Lady Eldon is not liable for an attempt to smuggle.
People v. Dlugash, 41 N.Y.2d 725, 733, 363 N.E.2d 1155, 395 N.Y.S.2d 419 (1977) (citing 1 Francis Wharton, Criminal Law § 225, at 304 n. 9 (12th ed.1932)). A more modern example: one cannot be convicted for possession of marijuana if one is holding a bag of oregano, despite truly believing or hoping it to be a bag of marijuana. See Richard J. Bonnie, et al., Criminal Law 260 (1997). Because Dornay's statements were not clearly false, it is immaterial she might have thought she perjured herself  it is not a crime for one to make true statements but think them false. We can no more hold this against her than we could accept a defendant's plea agreement for a crime we know he didn't commit.
¶ 71 Considering the context of the questions, coupled with the ambiguity of the questions themselves, one cannot say by a clear preponderance of the evidence these statements were false. Today the bar association falls far short of the heavy burden it must meet, whereas our majority suspends a legal career on a single word. Honesty is an important attribute of a lawyer; however, perjury must be proved with clarity not present here.
¶ 72 I dissent.
J.M. JOHNSON and CHAMBERS, JJ., concur.
NOTES
[1] While disciplinary proceedings are not criminal in nature, we address Dornay's duress defense here because she presented the issue in her briefing as a defense to her misconduct. Although this argument is not necessarily a defense to an RPC violation, it could mitigate the presumptive sanction if established.
[2] The presumptive sanction for intentionally providing false testimony is disbarment, according to ABA Standards 5.11 and 6.11. ABA Standards 5.11 states, in part, "[d]isbarment is generally appropriate when: [a] lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with administration of justice, false swearing, misrepresentation." ABA Standards 6.11 states, in part, "[d]isbarment is generally appropriate when a lawyer, with intent to deceive the court, makes a false statement . . . or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding."
[3] While disciplinary proceedings are not criminal in nature, we address Dornay's perjury defense here because she presented the issue in her briefing as a defense to her misconduct.
[1] Specifically, Dornay is charged with violating RPC 3.3(a)(1), 8.4(b), 8.4(c), and 8.4(d). Majority at 335.
[2] The testimony pertinent to the charges is:

Q [Spalter]: Okay. You've seen, I guess, Dave [Hick] testify in a court on behalf of the State or the County, or whatever?
A [Dornay]: Often, correct, often.
Q: Have you ever seen him, quote, on the job or out at work?
A: I actually did two ride alongs with Dave. So I actually have seen him on work for extends [sic] periods of time, correct.
Q: When was that, approximately?
A: I would say both occurred this summer.
Q: This past summer?
A: Correct.
Q: Okay. Have you ever seen him be rageful at any time?
A: Rageful?
Q: Yeah.
A: No.
Q: Rant and raved?
A: No.
Q: Berate?
A: No. I have to admit that I have seen him use what I call cop tone. He is occasionally a transport officer for our in-custody, and we have had a couple in-custody become unruly in the courtroom, and obviously he's taken a fairly aggressive stand in order to subdue those, and that was in open court with the judge on the bench, and it got the appropriate reactions from the defendants. But rage, no. Stern, yes.
Q: Okay. Have you seen him in any way rage at his son?
A: No, absolutely not. He is a very  from the three occasions that I've seen, he's a very devoted, gentle, very attentive father.
Clerk's Papers at 32-33 (Test. of Margita Dornay, Feb. 13, 2002).
[3] We must presume Dornay maintained the high morals of the profession. See In re Disciplinary Proceeding Against Little, 40 Wash.2d 421, 430, 244 P.2d 255 (1952). The bar association can rebut this presumption only by proving its case beyond a clear preponderance of the evidence. In re Disciplinary Proceeding Against Allotta, 109 Wash.2d 787, 792, 748 P.2d 628 (1988). Furthermore, with the exception of treason, the burden of proof necessary to sustain a perjury conviction is the highest known to law. See Olson, 92 Wash.2d at 136, 594 P.2d 1337. The bar fails to overcome this high hurdle.
[4] Federal law accords with our own:

The principles underlying the Bronston decision also bar perjury convictions for arguably untrue answers to vague or ambiguous questions when there is insufficient evidence of how they were understood by the witness. United States v. Eddy, 737 F.2d 564, 567 (6th Cir.1984); United States v. Tonelli, 577 F.2d 194, 200 (3d Cir.1978).
United States v. Glantz, 847 F.2d 1, 6 (1st Cir. 1988).